IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DOROTEA DIMAILIG,                                )
                                                 )
              Plaintiff,                          )
                                                 )
       v.                                         )          1:19-cv-441 (LMB/JFA)
                                                 )
ANDREW SAUL, Commissioner of Social              )
    Security,                                     )
                                                 )
              Defendant.                          )

## MEMORANDUM OPINION

In this civil action filed by plaintiff Dorotea Dimailig ("plaintiff" or "Dimailig") against

defendant Andrew Saul in his official capacity as the Commissioner of Social Security

("defendant" or "Commissioner"), plaintiff seeks judicial review of defendant's final decision

denying her claim for social security disability insurance benefits ("DIB"). Defendant's final

decision was based on determinations by an Administrative Law Judge ("ALJ") and the Appeals

Council for the Social Security Administration's Office of Disability Adjudication and Review

("Appeals Council") that plaintiff was not disabled as defined by the Social Security Act ("Act"),

42 U.S.C. § 301 et seq., and applicable regulations. Following cross-motions for summary

judgment, the assigned magistrate judge issued a Report and Recommendation ("Report") which

recommended denying summary judgment in favor of plaintiff and granting summary judgment

in favor of defendant. Before the Court are plaintiff's Objections to the Report ("Objections").

For the following reasons, plaintiff's Objections will be sustained, the Report's

recommendations will not be adopted, plaintiff's Motion for Summary Judgment will be granted

in part, defendant's Motion for Summary Judgment will be denied, the ALJ's decision will be

vacated, and this action will be remanded to defendant for further administrative proceedings pursuant to 42 U.S.C. § 405(g).

## I. BACKGROUND

On July 24, 2015, plaintiff, proceeding without representation, submitted a claim for DIB to the Social Security Administration ("SSA") with an alleged disability onset date of April 11, 2015,[1] [AR at 167] seeking DIB "due to the following illnesses, injuries or conditions: anxiety disorder, coronary artery disease, hypertension, neuropathy, diabetic, urinary problems." [AR at 70]. Although defendant found that plaintiff suffered from three severe medical impairments (ischemic heart disease, essential hypertension, and diabetes mellitus) and three non-severe medical impairments (peripheral neuropathy, degenerative disc disease, and anxiety-related disorder) [AR at 74], defendant found she was not disabled under the Act and its implementing regulations and denied her claim. [AR at 79]. In reaching that conclusion, the defendant found that plaintiff's "statements about the intensity, persistence, and functionally limiting effects of [her] symptoms" were only "[p]artially [c]redible" because they were "not entirely consistent with the total medical and non-medical evidence." [AR at 76]. The defendant's Personalized Disability Explanation regarding the denial of plaintiff's claim was:

> Your condition results in some limitations in your ability to perform work related
> activities. However, these limitations do not prevent you from performing work
> you have done in the past as a Proofreader II, as you described . . . your condition
> is not severe enough to keep you from working. We considered the medical and
> other information and work experience in determining how your condition affects
> your ability to work.

---

[1] There is some discrepancy in the record regarding the date on which plaintiff initiated her claim for DIB. Defendant's Disability Determination Explanation [AR at 70], final decision [AR at 15] and Motion for Summary Judgment state that plaintiff submitted her application on June 2, 2015. However, the record contains a document titled Application for Disability Insurance Benefits [AR at 167] which is dated July 24, 2015.

[AR at 79].

On October 14, 2015, after securing representation, plaintiff submitted a request for reconsideration of that decision [AR at 101], in which she explained that since submitting her claim, her "level of dysfunction fe[lt] worse," her "panic attacks [were] worse," and she "[was] more worried," as well as that she was experiencing new symptoms related to a catheter. [AR at 83]. Plaintiff also provided additional medical records in support of her claim. [AR at 83–85]. On December 9, 2015, the defendant again denied plaintiff's claim based on its determination that she was not disabled as defined by the Act and applicable regulations. [AR at 91]. As relevant here, the SSA found that plaintiff had the same severe and non-severe medical impairments, and its credibility assessment of plaintiff and explanation regarding the denial of plaintiff's claim were virtually identical to its prior assessment and explanation. [AR at 86–87, 92].

On January 8, 2016, plaintiff submitted a request for a hearing before an ALJ. [AR at 109]. The hearing was held on November 7, 2017, before ALJ Michael Krasnow. [AR at 30]. At the hearing, plaintiff testified about her medical impairments and their effect on her ability to work, answering questions from both the ALJ and her representative. [AR at 34]. A vocational expert also testified about the ability of an individual purportedly similar to plaintiff to perform work and answered hypothetical questions from both the ALJ and plaintiff's representative.[2] [AR at 62]. The details of plaintiff's and the vocational expert's testimony are discussed further below.

---

[2] "Vocational experts . . . are employment experts who know the mental and physical demands of different types of work." Fisher v. Barnhart, 181 F. App'x 359, 365 (4th Cir. 2006). "When a [vocational expert] is called to testify, the ALJ's function is to pose hypothetical questions . . . based on all evidence on record and a fair description of all the claimant's impairments so that the [vocational expert] can offer testimony about any jobs existing in the national economy that the claimant can perform." Harper v. Astrue, 2011 WL 3820681, at *2 (E.D. Va. Feb. 22, 2011).

On February 22, 2018, the ALJ issued a ten-page written decision denying plaintiff's claim for DIB on the ground that she was not disabled as defined by the Act and applicable regulations from the alleged onset date through the date of his decision. [AR 15–25]. In evaluating plaintiff's claim, the ALJ employed the requisite "five-step sequential evaluation":

> The ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the regulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the regulations; at step four, whether the claimant can perform [his or] her past work given the limitations caused by [his or] her medical impairments; and at step five, whether the claimant can perform other work.

Shinaberry v. Saul, 952 F.3d 113, 118–19 (4th Cir. 2020). Significantly, "[i]f the ALJ cannot make a conclusive determination at the end of the third step, the ALJ must then determine the claimant's residual function capacity, meaning the most a claimant can still do despite all of the claimant's medically determinable impairments of which the ALJ is aware, including those not labeled severe at step two." Woods, 888 F.3d at 689. The claimant's residual functional capacity ("RFC") is then used at steps four and five of the sequential evaluation. See id.

At step one, the ALJ concluded that plaintiff had not worked since April 2015. [AR at 17]. At step two, the ALJ concluded that plaintiff suffered from four severe medical impairments—ischemic heart disease, essential hypertension, diabetes mellitus, and arthritis—and numerous non-severe medical impairments, including degenerative disc disease, peripheral neuropathy, affective disorder, and anxiety-related disorder. [AR at 17–18]. At step three, the ALJ concluded that these medical impairments did not meet or equal the severity of an impairment listed in the regulations, and therefore that a final disability determination could not be made without proceeding to step four. [AR at 19].

4

Before proceeding to step four, the ALJ determined plaintiff's RFC. [AR at 19–24]. The details of the ALJ's RFC determination are discussed further below. In short, the ALJ determined that plaintiff had the RFC "to perform light work as defined in 20 C.F.R. § 404.1567(b)" with various physical limitations. Then, at step four, the ALJ concluded that plaintiff could perform her past work as a proofreader and office clerk because those positions did not require performance of work-related activities precluded by her RFC. [AR at 19, 24]. Accordingly, the ALJ determined that plaintiff was not disabled under the Act, without the need to proceed to step five. [AR at 25]. The ALJ therefore held that plaintiff was not entitled to DIB.

On February 26, 2018, plaintiff submitted a request for review to the Appeals Council. [AR at 163]. In her request, plaintiff explained that "the ALJ's decision [was] not supported by substantial evidence" because the ALJ "failed to . . . perform the evaluations mandated by the regulations, rulings, and circuit case law with regard to the issues of credibility of subjective complaints and opinions of treating physicians" and also "improperly relied on vocational expert testimony based on a hypothetical question which did not include all of [plaintiff's] impairments." [AR at 164]. On May 14, 2018, plaintiff submitted an eight-page letter in support of her request, explaining why the ALJ's decision "violated the . . . regulations and was unsupported by substantial evidence." [AR at 268]. Specifically, plaintiff asserted:

> This Council's rules permit it to review the ALJ's decision because (1) the ALJ failed to follow the treating physician rule in affording 'little' weight to the opinion of [plaintiff's] treating Internist, Celerino M. Magbuhos, M.D., regarding [plaintiff's] physical limitations . . . ; (2) the ALJ erred in failing to include primary aldosteronism/Conn's syndrome status post adrenalectomy, degenerative disc disease in cervical, thoracic, and lumbar areas of spine, peripheral neuropathy, obstructive sleep apnea, and status post coronary artery bypass grafting as 'severe' impairments; (3) the ALJ erred because his RFC is not well supported by medical evidence and the State agency medical consultants' opinions do not serve as an adequate basis for decision-making; [and] (4) the ALJ erred in failing to obtain the opinion of both a physical and mental health expert.

5

[AR at 268–69].

On February 12, 2019, the Appeals Council denied plaintiff's request for review of the

ALJ's decision because it "found no reason under [its] rules to review the [ALJ's] decision."

[AR at 1]. As a result of this denial, the ALJ's decision became defendant's final decision

regarding plaintiff's claim for DIB.  Plaintiff was instructed that she could seek court review of

the ALJ's decision by filing a civil action within 60 days of her receipt of the Appeals Council's

denial. [AR at 2].

Ten days after the Appeals' Council's decision, on February 22, 2019, plaintiff was found

disabled for the purpose of receiving state Medicaid benefits with a disability onset date of

August 28, 2018, which was during the time period when the Appeals Council was considering

her request for review. The "Explanation of Determination" section of the Medicaid decision

stated:

> [The ALJ's] denial of [plaintiff's] DIB claim on 2/22/18 cannot be adopted for
> this Medicaid claim due to [plaintiff] alleging onset of a new condition: asthma.
> The [Appeals Council's] denial of that DIB claim on 2/12/19 [found] that the
> [ALJ's] decision stands as written with no basis to vacate and remand the [ALJ's]
> decision. Neither the ALJ nor [the Appeals Council] considered the asthma
> condition and [plaintiff's] request for appeal did not allege that condition. Since
> the asthma condition had not been considered in the ALJ or [Appeals Council]
> proceedings, this current Medicaid claim was fully developed for all alleged
> conditions listed on [plaintiff's] Medicaid application, including the newly alleged
> asthma.

[Dkt. No. 13-1]. The decision concluded that "Vocational Rule 202.06 applies in this Medicaid

claim and the rule directs a decision of DISABLED." [Dkt. No. 13-1 (emphasis in original)].

On April 12, 2019, plaintiff timely filed this civil action seeking review of the ALJ's

decision. [Dkt. No. 1]. The parties subsequently filed cross-motions for summary judgment.

[Dkt. Nos. 12, 15]. In her motion, plaintiff argued (1) that "the ALJ's decision should be

reversed because the ALJ failed to properly classify [plaintiff's] asthma as a medically

determinable impairment," and (2) that "the ALJ's decision should be reversed because the ALJ

failed to provide good reasons for rejecting [plaintiff's] treating source's opinions," referring to

the opinions of plaintiff's internist, Dr. Celerino Magbuhos. [Dkt. No. 13]. As a remedy, plaintiff

asked the that Court either "order immediate payment of Social Security disability benefits with

an onset of disability as alleged by plaintiff," or remand her DIB claim for further proceedings.

Id. In response, defendant argued (1) that "the ALJ fully accounted for plaintiff's respiratory

limitations in his carefully crafted RFC assessment," and (2) that "substantial evidence supports

the ALJ's finding that Dr. Magbuhos' opinions were entitled to little weight." [Dkt. No 16].

On September 30, 2019, the assigned magistrate judge issued an order regarding

plaintiff's asthma. The magistrate judge explained:

> Having initially reviewed the parties' motions for summary judgment, there
> seems to be no dispute that plaintiff has a medically determinable impairment of
> asthma. As detailed in plaintiff's memorandum, the plaintiff was repeatedly
> diagnosed with asthma, she was prescribed various medications for asthma, and
> she was treated for asthma for an extended period of time. A review of the
> [ALJ's] decision reveals that he failed to identify plaintiff's asthma as either a
> severe or other medically determinable impairment. . . . Upon review of
> [defendant's] opposition to plaintiff's motion [for summary judgment] and its
> own cross-motion for summary judgment, [defendant] has not fully addressed the
> issue of plaintiff's diagnosis of asthma and the ALJ's failure to identify that
> diagnosis as a medically determinable impairment. A review of the [ALJ's]
> decision reveals only a single, specific reference to asthma in the context of [one]
> medical visit. . . . While there are other references to shortness of breath and
> dyspnea on exertion and lack of wheezing or rales in the ALJ's decision, there is
> no reference to those being related to a consideration of asthma. Those references
> may be related to the severe impairments of ischemic heart disease and essential
> hypertension found by the ALJ and not to plaintiff's asthma.

[Dkt. No. 20]. The magistrate judge concluded that "the court cannot be placed in the position to

surmise what conditions the ALJ considered is determining the residual functional capacity.  The

ALJ must explain them in his decision." [Dkt. No. 20]. Accordingly, the magistrate judge

directed the defendant to file a five-page supplemental brief addressing plaintiff's asthma and the

ALJ's failure to discuss how plaintiff's asthma affected her ability to work, in the event that the defendant "decide[d] to continue to pursue this action." [Dkt. No. 20]. On October 7, 2019, defendant submitted a supplemental brief arguing that "the lack of discussion [of plaintiff's] asthma at step two [was]—at most—harmless error" because "the ALJ continued the sequential analysis past step two and considered the limitations of plaintiff's asthma in the subsequent steps." [Dkt. No. 21].

On November 25, 2019, the magistrate judge issued the Report, recommending that plaintiff's motion for summary judgment be denied and defendant's motion for summary judgment be granted. [Dkt. No. 25]. With regard to plaintiff's asthma, the Report reasoned that "[t]he ALJ's omission of plaintiff's asthma at step two of the analysis [was] not reversible error nor harmful error" because "plaintiff's asthma was considered in the residual functional capacity assessment." [Dkt. No. 25 at 28 and 31]. The Report further reasoned that plaintiff's state Medicaid benefits determination "[was] extra-record evidence and [did] not support a finding that the ALJ's decision [was] unsupported by substantial evidence" because it "was correctly not included in the record," it "[did] not lead to a finding that the ALJ's decision [was] unsupported by substantial evidence," and it "[was] not 'new evidence' requiring remand of the case." [Dkt. No. 25]. With regard to Dr. Magbuhos' opinions, the Report reasoned that "the ALJ provided good reasons for affording less than controlling weight to [his] opinions" because of their "internal inconsistencies" as well as "their inconsistency with other evidence in the record and plaintiff's own testimony." [Dkt. No. 25].

On December 9, 2019, plaintiff timely filed her Objections to the Report. [Dkt. No. 26]. The parties' cross-motions for summary judgment, the Report, and plaintiff's Objections to the Report, all of which concern the ALJ's decision, are now properly before the Court.

## II. DISCUSSION

### A. **Standard of Review**

"Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the court, having reviewed the record in its entirety, shall make a de novo determination of those portion of the [Report] to which a party has specifically objected." Emami v. Bolden, 241 F. Supp. 3d 673, 679 (E.D. Va. 2017). "The Court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge, or recommit the matter to him with instructions." Id. Additionally, pursuant to 42 U.S.C. § 405(g), "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing."

### B. **Analysis**

Plaintiff raises two issues in her Objections to the Report. First, she argues the ALJ's failure to address her asthma at step two constitutes reversible error. In response, defendant concedes that the ALJ failed to address plaintiff's asthma at step two, but argues that the failure does not constitute reversible error because the ALJ subsequently considered plaintiff's asthma in determining her RFC, rendering the omission at step two harmless. Second, plaintiff argues that the ALJ's failure to provide good reasons for affording little weight to Dr. Maghubos' opinions constitutes reversible error. In response, defendant argues that inconsistencies among Dr. Maghubos' opinions and between his opinions and other record evidence justified the ALJ's decision to give his opinions little weight. Plaintiff has the better arguments.

The well-established purpose of DIB is to "provid[e] benefits to persons unable to work because of a serious disability." Woods v. Berryhill, 888 F.3d 686, 691 (4th Cir. 2018); see also Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984) (explaining that DIB "exist to give

financial assistance to disabled persons because they are without the ability to sustain themselves"). The Act, which governs the provision of DIB, is therefore "remedial in nature and unusually protective of claimants." Pearson v. Colvin, 810 F.3d 204, 210 (4th Cir. 2015). Indeed, the Fourth Circuit has for decades held that the Act is "to be broadly construed and liberally applied in favor of [claimants]." Dorsey v. Bowen, 828 F.2d 246, 248 (4th Cir. 1987).

Pursuant to these admirable principles, the Fourth Circuit has also "long recognized that the administrative hearing process," in which ALJs evaluate claims for DIB, "is not an adversarial one"; rather, "an ALJ has a duty to investigate the facts and develop the record independent of the claimant or [his or her] counsel." Pearson, 810 F.3d at 210. In discharging that duty, "[t]here are some things an ALJ must do" and "[t]here are . . . some things an ALJ may not do." Cordell v. Saul, 2019 WL 6257994, at *13 (N.D. W. Va. Nov. 4, 2019). For example, an ALJ "must both identify evidence that supports [his] conclusion[s] and build an accurate and logical bridge from that evidence to [his] conclusion[s]." Woods, 888 F.3d at 694. An ALJ also "has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts" that support his conclusions "while ignoring" facts that cut against them. Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017); see also Cordell, 2019 WL 6257994, at *13 ("[A]n ALJ excludes relevant evidence at [his] peril.").

Similarly, in reviewing an ALJ's decision, a district court has the obligation to "review[] the record to ensure that the ALJ's [factual] findings are supported by substantial evidence and that its legal [conclusions] are free of error." Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). Accordingly, "[t]his Court reviews the entire record in every Social Security case and will affirm the decision of the Commissioner only if it is supported by substantial evidence and is in accord with established legal standards." Abstance v. Berryhill, 2019 WL 669799, at *3 (D.S.C.

Feb. 19, 2019). Although substantial evidence review is deferential, the Fourth Circuit has

emphasized that a district court cannot "reflexively rubber-stamp an ALJ's findings." Lewis, 858

F.3d at 870. "Substantial evidence . . . means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." Sea "B" Mining Co. v. Addison, 831 F.3d 244, 252

(4th Cir. 2016).

 With regard to plaintiff's first argument, in this circuit, "district courts . . . have adopted

the view that an ALJ does not commit reversible error by omitting an impairment at step two, so

long as the ALJ considers the impairment [at] subsequent steps"; however, for the omission to be

harmless, the impairment must be "sufficiently considered." Woodson v. Berryhill, 2018 WL

4659449, at *4–5 (E.D. Va. Aug. 7, 2018). Here, it is undisputed that the ALJ omitted plaintiff's

asthma at step two. The parties' disagree, however, regarding whether the ALJ sufficiently

considered plaintiff's asthma in determining her RFC.

 The ALJ's decision, the transcript of the hearing on plaintiff's claim for DIB, and

plaintiff's medical records all demonstrate that the ALJ did not sufficiently consider plaintiff's

asthma. In determining plaintiff's RFC, the ALJ only referenced her asthma once, explaining

that, in May 2016, plaintiff "visited her internist for wheezing" and the "[r]ecommended

treatment included increasing her [inhaler] dosage for acute asthma exacerbation." [AR at 21].

Such a solitary, cursory reference does not constitute sufficient consideration. See, e.g.,

Bonvillain v. Berryhill, 2019 WL 1232840, at *14 (E.D. Va. Mar. 15, 2019) ("[C]ourts often find

an ALJ's failure to mention an impairment to be harmless so long as the ALJ discusses that

impairment later on in the sequential analysis."); Snelgrove v. Colvin, 2015 WL 13229265, at

*12 (D.S.C. Nov. 18, 2015) (explaining that the ALJ's one reference to the combined effects of

the plaintiff's severe and non-severe impairments "did not adequately explain his evaluation"

11

such that "the appropriate judicial review [could] not be had," and remanding the case "for full discussion by the ALJ of each of [the plaintiff's] impairments in combination throughout the sequential evaluation process").

The ALJ's sole reference to plaintiff's asthma is particularly stark given that plaintiff referenced it at least three times during the hearing and that it is extensively documented in her medical records. Most notably, at the hearing, plaintiff testified that she "always has [her] asthma attack[s]" if she does not spend "30 minutes laying down" approximately "five to six times a day." [AR at 56-57]. She also testified that she occasionally participates in line dancing classes and goes for walks because those activities help mitigate her otherwise significant asthma symptoms. [AR at 47-48, 58-59]. This testimony should have prompted the ALJ to include more discussion of plaintiff's asthma in the RFC determination. See, e.g., Baker v. Berryhill, 2019 WL 4148350, at *8 (E.D. Va. Aug. 12, 2019) ("[U]pon hearing that [the plaintiff] was suffering from migraines at the administrative hearing, the ALJ should have reviewed the record for this impairment and discussed it in [the] RFC analysis. The ALJ neglected to discuss [the plaintiff's] history of migraines and how they would not prevent her from performing light work. The Court, therefore, cannot agree with [the defendant] that the [ALJ's] omission was harmless.").[3]

As the magistrate judge explained in his order for supplemental briefing, plaintiff's medical records also confirm that "[she] was repeatedly diagnosed with asthma, she was prescribed various medications for asthma, and she was treated for asthma for an extended period of time." [Dkt. 20]. For example, as early as March 2015, one month before her alleged

---

[3] The ALJ's decision acknowledged that during the hearing plaintiff had complained of "shortness of breath and dyspnea on exertion," but immediately thereafter concluded that plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." [AR at 20].

disability onset date, plaintiff was diagnosed with asthma and prescribed two medications taken by inhaler to help manage her asthma. [AR at 323–24]. In May 2016, plaintiff reported that she was still experiencing asthma symptoms, and was prescribed an increased dosage of at least one of her medications. [AR at 876–78]. And in March 2017, plaintiff's medical records regularly confirmed her asthma diagnosis. [See, e.g., AR at 1409]. This substantiation of plaintiff's asthma in the record should also have prompted greater consideration by the ALJ in his RFC determination. See, e.g., Baker, 2019 WL 4148350, at *8.

Defendant attempts to justify the ALJ's failure to include discussion about plaintiff's asthma by asserting that the ALJ addressed plaintiff's respiratory issues more broadly and included a limitation in her RFC that was "clearly targeted at avoiding . . . common asthma triggers." Defendant, in its response to plaintiff's Objections, also acknowledges, however, that "[p]laintiff had potential respiratory limitations stemming from several different diagnoses," not just asthma. [Dkt. No. 27 at 7–8]. Thus "[i]t may well be" that the ALJ's discussion of plaintiff's respiratory issues more broadly was intended to include her asthma, "[b]ut meaningful review cannot rest on such guesswork." Woods, 888 F.3d at 694. Moreover, defendant at other times urges the Court to separate plaintiff's specific asthma complaints from her general respiratory complaints. For example, in minimizing the severity of plaintiff's asthma, defendant asserts that "plaintiff only sought treatment for asthma-related complaints once during the relevant period," referring to the May 2016 incident to which the ALJ had referred. [Dkt. No. 27 at 7]. Yet plaintiff plainly sought treatment on other occasions for respiratory-related complaints, such as when she went to the emergency room in July 2016 complaining of "chest pain and shortness of breath." [AR at 21]. Defendant's attempt to have it both ways on this issue is unavailing.

"While an ALJ's duty to develop the record is not never-ending, it appears patently obvious that the ALJ should have considered" plaintiff's asthma in more detail, particularly given her repeated complaints about it at the hearing and its thorough documentation in her medical records. Bonvillain, 2019 WL 1232840, at *14. The ALJ's failure to consider the plaintiff's asthma cannot be dismissed as harmless error. Unlike the Bonvillain case, in which the plaintiff provided no evidence "to indicate that the ALJ's consideration of [the omitted impairment] would potentially alter the RFC formulation in any meaningful way," plaintiff has provided such evidence here. Id. Specifically, plaintiff has provided a Virginia Medicaid document which, though not part of the administrative record, explains that plaintiff was found disabled for the purpose of receiving state Medicaid benefits just ten days after her claim for DIB was denied by the Appeals Council. [See Dkt. No. 13-1]. That disability finding was based on a time period which began before the Appeals Council resolved her appeal. In explaining why plaintiff was found disabled for state Medicaid purposes but not for DIB purposes, the Medicaid document explicitly states that "[n]either the ALJ nor the [Appeals Council] considered [plaintiff's] asthma condition" in denying her claim for DIB. [Dkt. No. 13-1].

Defendant emphasizes that plaintiff's claim for state Medicaid benefits covered a slightly later time period than her claim for DIB and that the two programs are separately administered, but neither of these facts diminishes the importance of the Medicaid document's recognition that the ALJ failed to give adequate consideration to plaintiff's asthma. Moreover, neither of these facts calls into question that "the purpose and evaluation methodology of both programs are closely related." Woods, 888 F.3d at 692. Indeed, it on this basis that the Fourth Circuit recently held that an ALJ "must give substantial weight" to a prior state disability decision or provide "persuasive, specific, valid reasons" for not doing so. Id.; see also Bird v. Comm'r of Social

14

Security, 699 F.3d 337, 343 ("[A]nother agency's disability determination cannot be ignored and must be considered."). Had the state Medicaid decision been issued eleven days earlier, plaintiff could have brought it to the Appeals Council's attention and the Appeals Council likely would have been required to consider it. For these reasons, the ALJ's failure to consider plaintiff's asthma at step two and in determining her RFC constitutes reversible error, justifying remand so that the ALJ can properly consider plaintiff's asthma in making his disability determination.

With regard to plaintiff's second argument—whether the ALJ failed to afford adequate weight to the opinions of plaintiff's long-time treating physician, Dr. Magbuhos—"the ALJ is required to give controlling weight to opinions proffered by a claimant's treating physicians so long as the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record," and an ALJ's decision to give less than controlling weigh to a treating physician's opinions cannot be "perfunctory." Lewis, 858 F.3d at 867.

Here, Dr. Maghubos' opinions were primarily recited in two medical source statements. In the first statement, dated October 18, 2015, Dr. Maghubos indicated that he had been treating plaintiff for approximately 14 years for neck pain, hand pain and numbness, and knee pain, and that his prognosis for plaintiff was "poor." [AR at 468]. For example, Dr. Magbuhos stated that plaintiff could "sit and stand/walk" for "[l]ess than 2 hours" in an 8-hour working day; needed to lie down during the day to "relieve pressure on [her] neck [and] spine"; needed to elevate her legs for 3 hours during the day to "alleviate knee pressure"; was "[i]ncapable of even low-stress jobs"; and could perform a variety of physical activities "[l]ess than occasionally," i.e. "0–10%" of the time. [AR at 468–70]. He also described plaintiff's "intensity level of pain" as "8–9/10," rated her "credibility with regards to claims of pain" as "good," confirmed that there was "an

objective medical reason for the pain," and stated that her "disability [was] not likely to change." [AR at 471].

In the second statement, dated October 13, 2017, Dr. Magbuhos indicated the he had been treating plaintiff for "anxiety disorder" and "low[er] back pain." His prognosis for plaintiff is illegible, but appears to say "with medications prognosis is fare." [AR at 1895]. Dr. Magbuhos stated that plaintiff experienced symptoms of her impairments everyday, including "during attack[s] of anxiety"; that plaintiff still could "sit and stand/walk" for "[l]ess than 2 hours" in an 8-hour working day due to "severe pain [in] [the] low[er] back region"; needed to lie down during the day to "relieve the pain"; no longer needed to elevate her legs; could only drive "alone" for "15–20 minutes"; was "[i]ncapable of even low-stress jobs"; and could perform a variety of physical activities either "[l]ess than occasionally," i.e. "0–10%" of the time, or "occasionally," i.e., "10–33%" of the time." [AR at 1895–97]. He also again described plaintiff's "intensity level of pain" as "8–9/10," although "intermittent," rated her "credibility with regards to claims of pain" as "credible," confirmed that there was "an objective medical reason for the pain," and stated that her "disability [was] not likely to change." [AR at 471].

The ALJ gave these statements "little weight" on the ground that they were "inconsistent internally" and inconsistent with other record evidence, such as other medical records and plaintiff's testimony. [AR at 24]. Specifically, the ALJ reasoned that Dr. Magbuhos' statements contained different prognoses, including a more recent prognosis of "fair," and that plaintiff's medical records and her testimony both "show[ed] that she ha[d] greater abilities than indicated by these opinions." [AR at 24]. None of these rationales is persuasive. First, that plaintiff's prognosis improved over a two-year time period is not a ground on which to discredit Dr. Magbuhos' statements; indeed, the Fourth Circuit has cautioned against "summarily"

discrediting statements based on treatment having "affor[ed] [a claimant] some temporary relief." Brown v. Comm'r of Social Sec. Admin., 873 F.3d 251, 270 (4th Cir. 2017).

Second, plaintiff's medical records for her visits to Dr. Magbuhos support his assessment of plaintiff's medical impairments. For example, during her April 11, 2015 visit, she reported recurrent neck and chest pain as well as "significant stress," and Dr. Magbuhos increased her Xanax dosage; during her May 19, 2015 visit, she reported recurrent hand pain and numbness as well as "right bunion pain," and Dr. Magbuhos recommended she complete various hand exercises; during her October 13, 2015 visit, she reported recurrent neck pain which was "not improving" as well as hand pain and stiffness, and Dr. Magbuhos referred her for physical therapy; during her January 5, 2016 visit, she reported finger pain and "instability of the left knee" with a "tendency to buckle," and Dr. Magbuhos recommended that she complete various leg exercises; during her May 26, 2016 visit, she reported "increase[ed] cough[ing] and wheezing," and Dr. Magbuhos increased her inhaler dosages; during her November 15, 2016 visit, she reported "recurrent lower neck, upper back, and low[er] back pain," and Dr. Magbuhos prescribed her Tylenol and recommended various back exercises; and during her June 2, 2017 visit, she reported "recurrent chest congestion and wheezing," and Dr. Magbuhos prescribed her Augmentin for bronchitis. [AR at 618–19, 621–22, 665–67, 767–69, 875–78; 1331–35, 1603– 04]. Lastly, as discussed further below, the ALJ's discussion of plaintiff's testimony about her ability to engage in various activities failed to acknowledge her testimony about the limited extent to which she could engage in those activities. See Woods, 888 F.3d at 694.

Reading the record as a whole, there is at least some "indication that the ALJ . . . dredged up specious inconsistencies" in discrediting Dr. Magbuhos' opinions. Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015). Accordingly, the ALJ's failure to give Dr. Magbuhos' opinions

controlling weight constitutes reversible error, and this action will be remanded so that the ALJ

can properly consider Dr. Maghubos' opinions in making his disability determination.

On remand, there are several other deficiencies in the ALJ's decision which, although not

raised in the parties' cross-motions for summary judgment, should also be reconsidered.[4]

Specifically, it appears from the record that the ALJ may also have erred in discrediting

plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms,

including pain and fatigue, as well as by failing to sufficiently explain why additional RFC

limitations were not imposed regarding plaintiff's absenteeism and mental health impairments.

The SSA regulations "instruct ALJs not to reject a claimant's reports about the intensity

and persistence of her symptoms or about how her symptoms affect her ability to work solely

because the medical evidence does not substantiate the reports." Kennedy v. Saul, 781 F. App'x

184, 187 (4th Cir. 2019). "Instead, when examining the credibility of a [claimant's] statements,

the ALJ must consider the entire case record" and, as previously discussed, "must build a logical

and accurate bridge from the evidence to [his] conclusion that the [claimant's] testimony was not

credible." Id.  In doing so, it is "incumbent on [the ALJ] to provide a clearer explanation of his

reasons . . . such that it will allow for meaningful review of his decision." Monroe, 826 F.3d at

190.

One way in which ALJs often fail to build a logical bridge between the evidence and their

conclusion that a claimant's testimony was not fully credible is by summarily citing to the

---

[4] See, e.g., Woods, 888 F.3d at 694 ("Because these issues may recur on remand, we address
them now."); see also Monroe v. Calvin, 826 F.3d 176, 188 (4th Cir. 2016) ("[R]emand may be
appropriate where . . . other inadequacies in the ALJ's analysis frustrate meaningful review.");
Abstance v. Berryhill, 2019 WL 669799, at *3 (D.S.C. Feb. 19, 2019) (refusing to accept a
waiver argument because it would "affirm a potentially unjust decision" and result in "a truly
disabled person . . . be[ing] denied her legally entitled benefits" on the basis of "a technicality").

claimant's activities of daily living, i.e., the type of activities in which the claimant has testified that he or she can engage despite his or her medical impairments. For example, in Woods, the ALJ concluded that the plaintiff's complaints of pain were not fully credible because she testified that she could "maintain her personal hygiene, cook, perform light household chores, [and] shop"; however, the ALJ failed to consider or even acknowledge the plaintiff's testimony that she "[could] not button her clothes, ha[d] trouble drying herself after bathing, and sometimes need[ed] help holding a hairdryer; that she [could] prepare simple meals but ha[d] trouble cutting chopping, dicing, and holding silverware or cups; [that] it [took] her all day to do laundry; [and that] she shop[ped] only for necessities, and that process [took] longer than normal." 888 F.3d at 694. The court ultimately remanded that case to the ALJ, reasoning that "[a]n ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." Id. The rationale for this rule is straightforward: "Disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." Lewis, 858 F.3d at 868 n.3.

Here, the ALJ similarly concluded that plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with . . . other evidence in the record" because "[her] activities of daily living [were] inconsistent with her disability claim." [AR at 20, 23]. The ALJ then summarily stated that plaintiff "testified to cooking, cleaning, and grocery shopping on her own," "driv[ing] daily and attend[ing] religious services several times per month," and "participating in various physical activities such as line dancing . . . and walking up to three miles per day"; however, the ALJ failed to consider or even acknowledge plaintiff's testimony about the limitations she faced in these activities. [AR at 23]. For example, plaintiff testified that she could cook but "ha[d] to do [it] all the time sitting down,"

and sometimes needed "to lay down . . . and continue later on"; that she could do her own laundry but that her son and a friend did all of the other housecleaning, including "mopping, sweeping, [and] vacuuming"; that she could wash dishes but "easily drop[ped] a lot of thing[s]" and "ha[d] many glasses broken"; and that she could grocery shop on her own but "[went] with [her] son when he [was] home" because she was unable to "lift a gallon of milk" and "need[ed] someone to carry" the groceries to and from her car. Id. at 46–47, 59–60. As for her participation in a line dancing group, she explained that she could only do "slow, slow line dancing" in a group of mostly of 80-year-old individuals, and often had to stop "when it [went] fast." Id.

In light of this testimony, it is clear that the ALJ impermissibly "consider[ed] the type of activities [plaintiff] [could] perform without also considering the extent to which she [could] perform them." Woods, 888 F.3d at 694. As a result, the ALJ failed to "build a logical and accurate bridge" from the evidence to his conclusion that plaintiff's testimony was not fully credible. Kennedy, 781 F. App'x at 187. Accordingly, that conclusion should be revisited on remand.

The SSA regulations also "specif[y] the manner in which an ALJ should assess a claimant's RFC." Thomas v. Berryhill, 916 F.3d 307, 311 (4th Cir. 2019). "[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." Id. With regard to the first component, "[t]he ALJ must consider all of the claimant's physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect the claimant's ability to work." Id. With regard to the second component, "the ALJ must provide a narrative discussion describing how the evidence supports each conclusion." Id. And with regard to the third component, "[o]nce the ALJ has completed th[e] function-by function analysis, the ALJ can make a finding as to the claimant's RFC." Id. As relevant here,

20

"[t]he second component . . . is just as important as the other two"; "[i]ndeed, [Fourth Circuit] precedent makes clear that meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." Id.

Here, the ALJ failed to provide sufficient explanation as to why plaintiff's absenteeism and mental impairments did not result in additional limitations to her RFC. With regard to plaintiff's absenteeism, her psychiatrist reported that plaintiff visited her "1–2 [times] per month" over a four-year period, and that plaintiff's impairments and treatment would likely require plaintiff to miss work "[a]bout once a month." [AR at 719, 725]. Additionally, Dr. Magbuhos reported that plaintiff visited him "every 1–2 months," and that plaintiff's impairments and treatment would likely require plaintiff to miss work "[m]ore than three times a month." Id. at 468 , 471, 1898. These statements roughly accord with plaintiff's testimony about the frequency of her visits to these doctors. See id. at 60. Plaintiff also testified that she visited a doctor in general "like every week." Id. at 44. The ALJ's decision and the magistrate judge's Report document the high frequency of plaintiff's doctor visits. In particular, the magistrate Judge's very thorough Report described that, between April 2015 and October 2017, plaintiff visited a doctor in connection with her medical impairments approximately 53 times, which equates to approximately 1.71 times per month. [See Dkt. 25]. The height of plaintiff's doctor's visits was when she visited a doctor approximately five times in the month of June 2016. Id.

Significantly, all but five of plaintiff's doctor's visits over this period occurred on weekdays and presumably required her to miss work. Yet the ALJ's discussion of an absenteeism limitation was sparse and limited to affording little weight to plaintiff's therapist's and internist's opinions regarding her need to miss work. Specifically, the ALJ stated that "the overall record shows that [plaintiff's] symptoms have maintained on routine, conservative

21

medication management," and that "[t]here are no signs of . . . intensive medical treatment to support that an absenteeism is appropriate." [AR at 24]. This explanation is insufficient to "describe[e] how the evidence supports [the ALJ's] conclusion." Thomas, 916 F.3d at 311 (4th Cir. 2019); see also Monroe (cautioning against failures to "ma[ke] specific findings" about whether a claimant's condition would "necessitate[e] breaks in work and if so, how often").

The insufficiency of the ALJ's explanation is best seen through the questions posed to the vocational expert at the hearing on plaintiff's claim for DIB. At the hearing, the ALJ only asked the vocational expert four hypothetical questions designed to gauge the plaintiff's ability to find work, none of which included an absenteeism limitation. [AR at 63–64]. Subsequently, plaintiff's representative questioned the vocational expert, and specifically asked about an absenteeism limitation. Id. at 65. The vocational expert responded that "assum[ing] the least restrictive" set of limitations hypothesized by the ALJ, an individual who "would be absent from work due to medical or mental health symptomology . . . at least two days a month" would not be able to maintain employment. Id. "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments." Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006). It also bears repeating that "an ALJ has a duty to investigate the facts and develop the record independent of the claimant or [their] counsel." Pearson, 810 F.3d at 210. Here, the ALJ did not adequately consider an absenteeism limitation, despite its clear relevance given plaintiff's medical history. More specifically, he failed to include that limitation in his hypothetical questions to the vocational expert. Accordingly, the ALJ's conclusion that an absenteeism limitation was not warranted should also be revisited on remand.

With regard to plaintiff's mental impairments, both plaintiff and her counsel emphasized her anxiety-related disorder at the hearing on her claim for DIB. For example, plaintiff testified that she experienced panic attacks up to "three, four days" a week, and her counsel emphasized that she experienced "persistent anxiety" which was "fairly overwhelming" and caused "inability to maintain time and attendance." [AR at 18, 40, 61, 68]. Plaintiff also testified that she took Xanax "as needed" when she experienced panic attacks, and that she had seen a therapist between once a week and once a month. [AR at 44]. The medical record, as documented in the magistrate judge's Report, supports this testimony; specifically, at least 17 of plaintiff's 53 doctor's visits were primarily in connection with her anxiety-related disorder. [See Dkt. 25]. Moreover, even at other visits, plaintiff's non-mental health doctors frequently noted her anxiety. For example, her doctor at a renal clinic stated: "[Plaintiff] has a lot of **anxiety** and I recommended that she follow up closely with her psychiatrist." [AR at 496 (emphasis in original)]. And Dr. Maghubos repeatedly noted that plaintiff appeared anxious. [See, e.g., AR at 369].

Despite this evidence, the ALJ's discussion of plaintiff's anxiety in relation to her RFC was limited. The ALJ gave "partial weight" to some of plaintiff's psychiatrist's opinions, but "lesser weight to her assessment of an absenteeism limitation" [AR at 24]. The ALJ gave "little weight" to plaintiff's Global Assessment of Functioning ("GAF") scores, which were "mild to moderate," explaining that "her GAF scores [were] mere snapshots of her mental condition and based primarily on subjective complaints" and were "inconsistent with her brief mental status examinations," which "show[ed] minimal anxiety or depression at times but essentially no

remarkable clinical findings."[5] [AR at 24]. This explanation too appears insufficient to "describe[e] how the evidence supports [the ALJ's] conclusion." Thomas, 916 F.3d at 311 (4th Cir. 2019). Accordingly, the ALJ's conclusion that a mental impairment limitation was not warranted should also be revisited on remand.

## III. CONCLUSION

For these reasons, by an Order to be issued with this Memorandum Opinion, plaintiff's Objections will be sustained, the Report will not be adopted, plaintiff's Motion for Summary Judgment will be granted in part, defendant's Motion for Summary Judgment will be denied, the ALJ's decision will be vacated, and this action will be remanded to the agency for further administrative proceedings consistent with this Memorandum Opinion pursuant to 42 U.S.C. § 405(g).

Entered this 17 day of November, 2020.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

[5] The ALJ addressed plaintiff's anxiety-related disorder at step three, concluding that plaintiff's mental health impairments, "considered singly and in combination, d[id] not cause more than a minimal limitation in [her] ability to perform basic mental work activities, and [were] therefore non-severe." [AR at 18]. In doing so, the ALJ discussed the "four areas of mental functioning" which "are known as the 'Paragraph B' criteria," concluding that plaintiff had "a mild limitation" in each; however, the SSA regulations make clear that the Paragraph B criteria "are not an RFC assessment" and are merely "used to rate the severity of mental impairments at steps [two] and [three] of the sequential evaluation process." Gullace v. Astrue, 2013 WL 691554, at *20 n.24 (E.D. Va. Feb. 13, 2012). In contrast, "[t]he mental RFC assessment used at steps [four] and [five] of the sequential evaluation process requires a more detailed assessment by itemizing various functions." Id. Moreover, the ALJ's discussion of the Paragraph B criteria suggests that the ALJ again failed to discharge his duty "to investigate the facts and develop the record independent of the claimant or [their] counsel." Pearson, 810 F.3d at 210. For example, the ALJ emphasized that plaintiff's testimony at the hearing on her DIB claim "focused primarily on" and "centered on" her physical impairments as opposed to her mental impairments. [AR at 18].